Argued at Pendleton October 29, 1923, reversed and remanded January 8, rehearing denied April 1, 1924.

ZULA EBELL, ADMX., v. OREGON–WASHINGTON R. & N. CO.

(221 Pac. 1062.)

**Commerce—Employee Engaged in Interstate Commerce Protected by Federal Act.**

1. Where a railroad employee at the time of injury is engaged in interstate commerce, his case is controlled by the federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665).

**Master and Servant—Injury Unexplained Raises No Inference of Negligence.**

2. The mere fact that an employee received injuries resulting in his death by reason of his being on the track in front of an

approaching engine, where his duty did not require him to be, without any explanation of how he came to be there, raises no inference of negligence.

## Master and Servant—Railroad Held not Negligent as to Brakeman Run Over.

3. In an action under the federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665) for the death of a brakeman who staggered four feet in front of helper engines, and was run over by the first engine, where the evidence showed that the fireman failed instantly to observe and communicate to the engineer an emergency stop signal given by brakeman of another train, and that because of such failure the engines were not brought to an immediate stop, but moved about forty-three feet towards the place, where deceased was to couple the helpers to his train by use of automatic couplers, *held*, that the evidence considered in connection with rules requiring both engineer and fireman to give close attention to signals was not sufficient in law to impute negligence to defendant.

## Courts—Federal Decisions Under Federal Act Controlling on State Court.

4. Decisions of the federal courts are controlling on state courts on questions of liability arising under the federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665).

## Master and Servant—Fireman's Failure to See Signal Held not Proximate Cause of Injury to Brakeman Run Over.

5. A locomotive fireman's failure to immediately see and communicate to the engineer an emergency stop signal given by a trainman *held* not the proximate cause of injury to a brakeman who, in going to make a coupling with automatic couplers, went on the track in front of a slowly moving engine, and was run over by the engine, which was four feet away from him when the signal was given, and moved about thirty-nine feet before stopping.

## Master and Servant—Causal Negligence Essential to Liability for Injury Under Federal Act.

6. Where railroad and employee are both engaged in interstate commerce within the federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), causal negligence of the railroad resulting in injury to the employee is necessary in order to warrant recovery, though it is not necessary that such negligence should be the sole cause of the injury.

## Master and Servant—Burden of Proving Causal Negligence on Plaintiff.

7. The burden of proving causal negligence of a carrier resulting in injury to an employee within federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665) is upon claimant asserting it.

---

4. State statutes and rules of law as applicable to actions under federal Employers' Liability Act, see note in 12 A. L. R. 693.

**Master and Servant—Liability Under Federal Act Predicated on Negligence Only.**

8. Under the federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), the right to sue for injuries to an employee is based on negligence only.

**Death—Administratrix cannot Recover Where Decedent Could not have Done so.**

9. The administratrix of a railroad employee killed while in the course of his employment cannot recover under the federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), where decedent could not have done so.

**Appeal and Error—Case Tried on Wrong Theory Should be Remanded for Retrial.**

10. Where administratrix of a railroad employee has recovered on an untenable theory, the appellate court on reversing the judgment should remand the cause for a new trial.

**Master and Servant—Instruction on Presumption of Care on Part of Deceased Held Error.**

11. In an action under the federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665) for the death of a brakeman run over by an engine after an emergency stop signal was given by another trainman, an instruction that the law presumes deceased exercised reasonable care for his own safety, and that the plaintiff was entitled to have the jury consider such presumption in determining the liability or nonliability, *held* erroneous in view of the like presumption in favor of defendant.

From Union: J. W. KNOWLES, Judge.

In Banc.

This action for damages under the federal Employers' Liability Act was brought by plaintiff as administratrix of the estate of Gerald Ebell, her deceased husband, a brakeman employed by the defendant company, who was run over by a locomotive and sustained injuries which resulted, a few hours later, in his death. The accident occurred in the daytime on November 20, 1921, near Durkee, a station on defendant's line between Baker and Huntington,

---

8. Constitutionality, application and effect of federal Employers' Liability Act, see notes in 47 **L. R. A. (N. S.)** 38; 48 **L. R. A. (N. S.)** 987; **L. R. A.** 1915C, 47.

Oregon. Plaintiff's intestate was an experienced brakeman, and, at the time of the accident, was employed on a freight train designated as Extra 2107 West. Upon the arrival of that train at the east switch at Durkee, in order to couple two helper engines in front of the caboose, the caboose was cut off and left east of the switch, and the remainder of the train was pulled up and stopped on the main line a short distance west of the switch. After cutting off the caboose from the train, the two helpers, coupled together, were moved from the passing track on to the main line through the east switch where they were coupled on to the caboose by another brakeman. While being so coupled, plaintiff's intestate threw the switch from the passing track to the main line. He then proceeded to walk by the side of the track to the rear car, to which he was to couple the helpers. While he was walking alongside of the track and the helpers were being moved towards the train he was seen by the engineer of the front helper to stop and talk with members of another train crew, at which point the helpers passed him. So far as the testimony discloses he was not again seen by any member of his own train crew or by the enginemen on the helpers until he was removed from under the cab of the front helper. He was run over by the front helper while in the center of the track and about 80 feet from the rear end of the train. No one saw him go upon the track and there is no explanation of how he came to be there. The cars and helpers were equipped with automatic couplers, and in order to make the coupling it was not necessary for him to go upon the track or between the front helper and the rear car of the train. The evidence shows that it was 39

feet from the front of the pilot to the cab of the front helper under which plaintiff's intestate was found when the helpers were stopped. The testimony discloses that for a distance of 10 feet back from the front of the pilot, the clearance between the ties and the attachments of the engine was from 10 to 12 inches, while from that point to the cab the clearance is less. Another freight train, Extra 2136 East, had pulled into Durkee and at the time of the accident was standing on the passing track by the side of Extra 2107. The passing track was on the fireman's side of the helpers and was an adjoining parallel track close to the main line.

At the time of the accident, William C. Neff, who was called as a witness by the plaintiff, was a brakeman on Extra 2136 East. He testified that while engaged in inspecting his own train he was standing at a point between the two trains about two and one half car-lengths, or 100 feet, in front of the rear end of the rear car of Extra 2107 West, which point was on the fireman's side of the helpers and about 180 feet from the place where plaintiff's intestate was run over. He was the only witness who saw the accident or ever knew that plaintiff's intestate was in danger. He testified that he saw plaintiff's intestate between the rails near the center of the track; that he was facing to the southwest, which would be at about right angles to the track, and was leaning over and staggering, about four feet in front of the helpers which were moving about four or five miles per hour; that he saw him fall in the center of the track with his feet towards the engine and the front part of the engine pass over him, and that upon seeing plaintiff's intestate in that situation he immediately holloed, saying, "Hey," or something to that effect, and gave what, in railroad parlance,

is known as a "violent stop" or "washout" signal, which is the ordinary stop signal given violently, and calls for the immediate stoppage of any train or engine movement. He then started to run between the trains to the place where plaintiff's intestate was, repeating the signal as he ran. Neff testified that immediately following his giving of the signal the helpers were stopped "right now," but all of the testimony, including his own, shows that the engine, for a distance of about 39 feet, passed over plaintiff's intestate, and this establishes the fact that the engine moved at least approximately 43 feet after Neff discovered plaintiff's intestate upon the track.

Harry Last, a brakeman on plaintiff's intestate's train, was called as a witness by plaintiff. He testified that after coupling the caboose to the helpers he rode on the front helper and got off on the engineer's side and that as he stepped off the engine he observed Neff giving the violent stop signal, and that as the front helper had then passed him he immediately turned to the engineer of the rear helper and repeated the signal.

The only other witness who testified concerning the accident was C. L. Larcom, the engineer on the front helper. He was a witness for the defendant and testified that he saw plaintiff's intestate stop alongside of the track and talk to the members of the other train crew; that he did not see him again until he was found under the cab; that he saw Neff, who, at the time, was on the engineer's side of the helpers and about opposite the cylinders of the front helper, give an emergency signal, and that upon receiving it, he immediately shut off the steam and applied the emergency brake and stopped the helpers within a distance of about 15 feet, and when stopped his helper was about 40 feet away from the rear end

of the car, to which it was to be coupled. The testimony shows that the tracks at that point have an ascending grade of 1 per cent to the west. The helpers were at the time moving west. There is no other testimony in the record in explanation of the accident. Nor is there any testimony in the record to explain what, if anything, caused the plaintiff to stagger or fall in front of the helpers, or what, if anything, prevented him from stepping off the track before the helpers, going but a little faster than he could walk, reached him.

Plaintiff offered expert testimony to the effect that the two helpers and caboose could have been stopped at a distance of from four to eight feet after the emergency brake was applied. This was contradicted by the testimony of other experts called by the defendant who testified that if going at the rate of four or five miles per hour, they could not have been stopped in less than from 18 to 35 feet, depending upon whether going at four or five miles per hour.

The rules of the company provide that signals must be given where they can be plainly seen, and when practicable all signals by hand must be given on the engineer's side, but signals received from the other side must be respected; that employees must not ride on the pilot of an engine, nor get on the front or rear of an engine as it approaches them, nor go between moving cars to uncouple, close or arrange knuckles of couplers, and, while switching, the engineer and fireman must both remain on the engine and give close attention to signals. The above is all of the testimony offered by either side in explanation of the accident.

The cause was tried to a jury and resulted in a judgment in favor of the plaintiff, from which the defendant has appealed.

REVERSED AND REMANDED. REHEARING DENIED.

For appellant there was a brief over the names of *Mr. W. A. Robbins, Mr. A. C. Spencer* and *Messrs. Crawford & Lakin,* with oral arguments by *Mr. Robbins* and *Mr. T. H. Crawford.*

For respondent there was a brief over the names of *Mr. F. S. Ivanhoe, Mr. Eugene Ashwill* and *Messrs. Greene & Hess,* with oral arguments by *Mr. Ivanhoe* and *Mr. Ashwill.*

RAND, J.—1. The plaintiff alleges and the defendant admits that at the time of the accident plaintiff's intestate and defendant were both engaged in interstate commerce. The case, therefore, is governed exclusively by the provisions of the federal Employers' Liability Act and "the applicable principles of common law as interpreted and applied in the federal courts." *Southern Ry. Co.* v. *Gray,* 241 U. S. 333 (60 L. Ed. 1030, 36 Sup. Ct. Rep. 558, see, also, Rose's U. S. Notes).

The whole evidence of the plaintiff discloses that the injury sustained by plaintiff's intestate was not caused by any violation by the defendant company of any federal statute enacted for the safety of its employees, nor by reason of any defect or insufficiency in its property or equipment. And there is no evidence in the record in explanation of how plaintiff's intestate, an experienced brakeman, whose duties did not require him to cross the track or to go upon it at all, came to be on the track and immediately in front of the helpers, 80 feet away from

the point where he himself was to make the coupling; nor why, being there, he did not step off the track in time to avoid injury; nor what, if anything, caused him to stagger and fall. From the time he was seen, by Larcom, talking to members of another train crew, to the time he was observed, by Neff, in front of the two helpers, his whereabouts are wholly unaccounted for.

2. There is no contention that plaintiff's intestate, while in the center of the track and only four feet away from the front of the engine, could be seen from the cab by either the engineer or fireman of the front helper, or that they had any knowledge of his being there. The fact that he sustained injuries resulting in his death by reason of his being on the track in front of an approaching engine, without any explanation of how he came to be there, in itself, raises no inference of negligence upon the part of the company, as "the fact of accident carries with it no presumption of negligence on the part of the employer." *Patton* v. *Texas & Pac. Ry. Co.,* 179 U. S. 658, 663 (45 L. Ed. 361, 21 Sup. Ct. Rep. 275, see, also, Rose's U. S. Notes). Hence, testimony which merely shows that plaintiff's intestate sustained injuries from which he died by being run over while on the track in front of a moving engine, where, at the time, his duties did not require him to be, in itself alone is not sufficient proof upon which to base an inference of negligence against the defendant company.

The rules of the company require both the engineer and fireman, while switching, to remain on the engine and give close attention to signals. Plaintiff contends, because of this rule and of evidence tending to show that the helpers could have been

110 Or.—43

stopped within from four to eight feet after the application of the emergency brake, and that when Neff first observed plaintiff's intestate staggering and falling on the track, he immediately gave an emergency stop signal, which, if it had been observed by the fireman of the front helper and had been instantly communicated to the engineer and the emergency brake had then been set, might have stopped the engines before plaintiff's intestate received the injury from which he died, that this was sufficient to establish negligence upon the part of the defendant. Over the objection and exception of the defendant the Circuit Court adopted that theory, holding it to be sufficient to take the case to the jury, and instructed the jury, in effect, that proof of these facts was sufficient to justify them in finding a verdict in favor of the plaintiff.

3, 4. Under a reasonable interpretation, the rule that the fireman, while switching, must remain on the engine and give close attention to signals does not mean that, while switching, he must discontinue the performance of all other duties and devote his entire attention to watching out for the safety of that particular employee who, at the time, is engaged in coupling his engine to another engine or car. The engines and cars of the defendant company are equipped with automatic couplers which couple from impact. In coupling it was not necessary for plaintiff's intestate to go between the cars, and the rules of the company forbade his doing so. Plaintiff's intestate was supposed to look out for his own safety, and neither the engineer nor fireman had reason to anticipate that he would go upon the track or that he would fail to exercise ordinary care and prudence for his own safety. As it was his duty, at the time of the accident, to couple the

helpers to the train, it was his duty to signal the engineer such information as was essential to their operation of the helpers and for the time being he had control of their movements. Ordinarily, they would look to him alone for signals. If, however, they saw signals given by other trainmen, they were bound to observe them, but primarily they were only required to look for signals to the one in charge of their operations. Not seeing him in a place of danger and not having any reason to anticipate that he was in a place of danger, they were under no legal duty to him. They had a right to rely upon his doing everything essential to his own safety, and were not required to take unusual precautions to prevent an injury which they had no reason to anticipate. As the engineer and fireman, in that respect, owed him no legal duty, the defendant company could not be charged with a greater duty towards him than that owed by them. He was run over 80 feet away from the place where the coupling was to be made. The track over which the helpers were to move was between that place and the rear end of the train. It was this portion of the track that they were required to observe. It was not to be expected that they would receive a signal intended to control the movement of their engines from a point between two freight trains standing on parallel tracks and close together, which point, the whole evidence shows, was 180 feet away from where they then were and 100 feet beyond that part of the track over which they would have to move to reach the rear car of the train to which the helpers were to be coupled. To hold, under these circumstances, that evidence tending to show the failure of the fireman to instantly observe and communicate Neff's emergency

stop signal to the engineer, and that because of such failure the engines were not brought to an immediate stop, was sufficient, in law, to impute negligence to the defendant company, would place a too strict accountability upon the carrier and one which finds no sanction in any decision of the federal courts, whose decisions are controlling upon us upon every question of liability arising under the federal Employers' Liability Act.

5. But regardless of these considerations, the failure of the fireman to observe and communicate Neff's emergency stop signal was not a proximate cause of the injury. The injury resulted from decedent's going upon the track in front of a moving engine and remaining there until the engine ran over him. This was the real and immediate cause of his injury, and this injury, so far as the evidence discloses, was brought about through no fault of the defendant. The facts proved were not sufficient to justify an inference that, if the fireman had seen the emergency stop signal when first given by Neff, it would have been possible to have avoided the injury, and whether the injury could have been avoided or not is clearly a mere surmise. But as the fireman's failure was not the omission of a legal duty, it was not a proximate cause of the injury, but was merely a circumstance attendant upon a condition brought about by decedent's presence upon the track immediately in front of a moving engine. It neither caused him to be there, nor caused him to suffer the injuries from which he died.

6. The law is settled by the decisions of the Supreme Court of the United States that where an injury results to a railroad employee, while the carrier and employee are both engaged in interstate

commerce, the causal negligence of the carrier is the test of its liability, and that if there was no causal negligence upon the part of the carrier, which in some way contributed or co-operated to bring about the injury complained of, the carrier is not liable: *New York Cent. R. R. Co.* v. *Winfield,* 244 U. S. 147 (Ann. Cas. 1917D, 1139, L. R. A. 1918C, 439, 61 L. Ed. 1045, 37 Sup. Ct. Rep. 546, see, also, Rose's U. S. Notes); *Erie R. R. Co.* v. *Winfield,* 244 U. S. 170 (Ann. Cas. 1918B, 662, 61 L. Ed. 1057, 37 Sup. Ct. Rep. 556).

7-9. Before a recovery can be had under the federal Employers' Liability Act, it must be established by the evidence that the negligence of the carrier was a proximate cause of the injury complained of. It is not necessary that the negligence of the carrier should be the sole cause of the injury, but the negligence of the carrier must, in some way, have co-operated to cause the injury complained of. There must be a proximate and causal relation between the damages sought to be recovered and the negligence of the carrier. The causal negligence of the carrier is an affirmative fact which the plaintiff must establish to entitle her to recover: *Texas etc. Ry Co.* v. *Barrett,* 166 U. S. 617 (41 L. Ed. 1136, 17 Sup. Ct. Rep. 707, see, also, Rose's U. S. Notes); *Patton* v. *Texas & Pac. Ry. Co., supra.* "It is not sufficient for an injured employee to show that the employer may have been guilty of negligence—the evidence must point to the fact that he was." *Patton* v. *Texas & Pac. Co., supra.* Under the Employers' Liability Act, the right to sue is based on negligence only: *Seaboard Air Line Co.* v. *Horton,* 233 U. S. 492 (Ann. Cas. 1915B, 475, L. R. A. 1915C, 1, 58 L. Ed. 1062, 34 Sup. Ct. Rep. 635, see, also, Rose's

U. S. Notes). Before there can be a recovery, "it must appear that the injury was the natural and probable consequence of the negligent or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." *Milwaukee etc. Co.* v. *Kellogg,* 94 U. S. 469 (24 L. Ed. 256). But "if the negligence of the railroad company contributed to, that is to say, had a share in producing, the injury, the company was liable, * * ." *Grand Trunk Ry. Co.* v. *Cummings,* 106 U. S. 700 (27 L. Ed. 266, 1 Sup. Ct. Rep. 493, see, also, Rose's U. S. Notes). If plaintiff's intestate could not have recovered for the injury he sustained, his administratrix cannot recover for his death: *Frese* v. *Chicago etc. R. R. Co.,* 263 U. S. 1 (68 L. Ed. —), decided October 15, 1923. Before a carrier, under the act, can be held liable for the death or injury of an employee, it must appear that the carrier failed in the performance of some duty which it owed to that employee: *Nelson* v. *Southern Ry. Co.,* 246 U. S. 253 (62 L. Ed. 699, 38 Sup. Ct. Rep. 233); affirmed, 170 N. C. 170 (86 S. E. 1036).

In *St. Louis etc. R. R. Co.,* v. *Conarty,* 238 U. S. 243 (59 L. Ed. 1290, 35 Sup. Ct. Rep. 785, see, also, Rose's U. S. Notes), an employee engaged in switching received injuries in a collision between a switch engine on which he was riding and a loaded freight-car having no coupler or drawbar, which latter car was about to be placed on an isolated track for repair, and had been left near the switch leading to that track. The collision occurred in the dark and the deceased was standing on the footboard at the front of the switch engine, where he was caught between the engine and the body of the car at the end from which the coupler and drawbar were missing.

Under one view of the evidence, had these appliances been in place, it would have kept the engine and the body of the car sufficiently apart to have prevented the injury, but, in their absence, the engine came in immediate contact with the sill of the car, causing injuries from which he died six days later. The negligence charged was the failure to have the car equipped as required by the Safety Appliance Acts. In its decision the court said:

"It is not claimed, nor could it be under the evidence, that the collision was proximately attributable to a violation of those provisions, but only that had they been complied with it would not have resulted in injury to the deceased. It therefore is necessary to consider with what purpose couplers and drawbars of the kind indicated are required, for where a duty is imposed for the protection of persons in particular situations or relations a breach of it which happens to result in injury to one in an altogether different situation or relation is not as to him actionable."

The decision of the court, deciding that the plaintiff was not entitled to recover, was announced in these words:

"We are of opinion that the deceased, who was not endeavoring to couple or uncouple the car or to handle it in any way but was riding on the colliding engine, was not in a situation where the absence of the prescribed coupler and drawbar operated as a breach of a duty imposed for his benefit, and that the Supreme Court of the State erred in concluding that the Safety Appliance Acts required it to hold otherwise."

In *Lang* v. *New York Cent. R. R. Co.*, 255 U. S. 455 (65 L. Ed. 729, 41 Sup. Ct. Rep. 381), plaintiff's intestate, a brakeman, was crushed between a car upon which he was riding and a car without drawbar or coupler standing on the siding on to which the car

he was riding had been kicked, and it was his duty to stop the car before coming into collision with the defective car. The defective car was loaded with iron and was standing on the siding waiting to be unloaded. He died from the injuries. In deciding the case the court held:

"It was the duty of the crew, we repeat, and immediately the duty of Lang, to stop the colliding car and to set the brakes upon it, 'so as not to come into contact with the crippled car,' to quote again from the trial court. That duty he failed to perform, and, if it may be said that, notwithstanding, he would not have been injured if the car collided with had been equipped with drawbar and coupler, we answer, as the Court of Appeals answered, still 'the collision was not the proximate result of' the defect. Or, in other words, and as expressed in effect in the Conarty Case, that the collision under the evidence cannot be attributed to a violation of the provisions of the law 'but only that had they been complied with it (the collision) would not have resulted in the injury to the deceased.' "

In *Davis* v. *Wolfe,* 263 U. S. 239 (68 L. Ed. —, 44 Sup. Ct. Rep. 64), decided November 12, 1923, Mr. Justice SANFORD, in commenting upon these two cases and two other cases not necessary to be referred to here, said: "The rule clearly deducible from these four cases is that, on the one hand, an employee cannot recover under the Safety Appliance Act if the failure to comply with its requirements is not a proximate cause of the accident which results in his injury, but merely creates an incidental condition or situation in which the accident, otherwise caused, results in such injury." In referring especially to the two last cited cases, he said: "In these cases it was held that, the collisions not being proximately attributable to the absence of automatic

couplers on the standing cars, the carriers were not liable for the injuries received by the employees, even if the collisions would not have resulted in injuries to them had the couplers been on the standing cars, the requirement of automatic couplers not being intended to provide a place of safety between cars brought into collision through other causes.''

10. Since the plaintiff tried her case in the Circuit Court upon a theory which we hold to be untenable, we deem it our duty to remand the cause for a new trial, thereby affording her an opportunity, if she can, of showing whether or not decedent's being on the track at the time of the injury was caused by any negligent act or omission of the defendant company and under circumstances which relieved the decedent from assuming the risk.

11. Since the case may be tried, we call attention to an instruction given upon the former trial which we deem to be error. The court instructed the jury to the effect that the law presumes that the deceased exercised reasonable care for his own safety and that the plaintiff was entitled to have the jury consider said presumption in determining the liability or nonliability of the defendant. The giving of this instruction was error, because the presumption that the defendant company and its employees exercised due care upon their part was equally strong, and this offset and counteracted the presumption of due care upon the part of the deceased. ''But the negligence of the defendant cannot be inferred from a presumption of care on the part of the person killed. A presumption in the performance of duty attends the defendant as well as the person killed. It must be overcome by direct evidence. One presumption cannot be built upon another.'' *Looney* v. *Metro-*

*politan R. R. Co.,* 200 U. S. 480 (50 L. Ed. 564, 26 Sup. Ct. Rep. 303, see, also, Rose's U. S. Notes). See, also, *Prall* v. *Great No. Ry. Co.,* 105 Wash. 24 (177 Pac. 637).

Judgment reversed and cause remanded.

REVERSED AND REMANDED. REHEARING DENIED.

BURNETT, J., not sitting.